380 So.2d 313 (1979)
Melba Till ALLEN
v.
STATE.
3 Div. 936.
Court of Criminal Appeals of Alabama.
November 20, 1979.
Rehearing Denied December 18, 1979.
*314 Richard D. Horne and James E. Atchison, of Hess, Atchison & Stout, Mobile, for appellant.
Charles A. Graddick, Atty. Gen. and James F. Hampton, Asst. Atty. Gen., for the State.
*315 DeCARLO, Judge.
Melba Till Allen was indicted by the grand jury of Montgomery County on a two-count indictment charging her with violation of Act No. 130 of the Alabama Legislature, Regular Session, 1975. The counts charge that she used her position as Alabama State Treasurer for personal gain by obtaining loans which benefited her in exchange for placing State treasury funds in the American Bank of Geneva, Alabama.
She was arraigned in the presence of her attorneys and, subsequently, filed demurrers and a motion to dismiss. The demurrers and the motion to dismiss raised both the vague and ambiguous nature of the indictment and the unconstitutionality of the statute under which the indictment was brought. On the day of the trial, a motion for a change of venue, based on the ground of pretrial publicity in Montgomery, was filed and argued on behalf of the appellant. It was subsequently denied.
A jury trial was held, and the appellant was found guilty. She was sentenced to a term of three years in the penitentiary and notice of appeal was filed. Later, a motion for a new trial was argued and denied.
The indictment upon which this prosecution was based reads, in pertinent part, as follows:

"COUNT I
"The Grand Jury of Said County charge that, before the finding of this indictment,

"MELBA TILL ALLEN
"[W]hose name is to the Grand Jury otherwise unknown, a public official or employee, to-wit: Alabama State Treasurer, did unlawfully and feloniously use an official position or office, to-wit: the position or office of Alabama State Treasurer, to obtain direct personal gain for herself or her family or any business with which she or a member of her family was or is associated, by, to-wit: placing or agreeing to place or offering to place public or state funds or monies over which she had official access, custody and control, on deposit in or with, to-wit: the American Bank of Geneva, a state chartered banking institution, located in or near the city of Geneva, Alabama, to obtain from the said bank direct personal financial gain, to-wit: a loan and/or loans, or credit to the said MELBA TILL ALLEN or a business with which she or a member of her family was or is associated, which said use and gain is not specifically authorized by law, contrary to the provisions of Act 130, Regular Session of the Alabama Legislature, 1975, against the peace and dignity of the State of Alabama;

"COUNT II
"The Grand Jury of said County further charges that, before the finding of this indictment,

"MELBA TILL ALLEN
"[W]hose name is to the Grand Jury otherwise unknown, a public official or employee, to-wit: the Alabama State Treasurer, did unlawfully and feloniously use an official position or office, to-wit: the position or office of Alabama State Treasurer, to obtain direct personal gain for herself or her family or any business with which she or a member of her family was or is associated, by, to-wit: placing or agreeing to place or offering to place, or agreeing to offer to place public or state funds or monies over which she had official access, custody or control, on deposit in or with, to-wit: the American Bank of Geneva, a state chartered banking institution, located in or near the city of Geneva, Alabama, in order to receive, to-wit: a loan and/or loans, or credit, and/or to obtain direct personal financial gain for the said MELBA TILL ALLEN or her family or a business with which she or a member of her family was or is associated which said use and gain is not specifically authorized by law, contrary to the provisions of Act 130, Regular Session of the Alabama Legislature, 1975. . ."
*316 In support of this indictment the State presented the following evidence.
Frances Merriwether Bolden was the State's first witness. Before any testimony was taken, a stipulation, which included documents from the Secretary of State showing that the appellant was Treasurer of the State of Alabama, was entered into by the defense counsel and the State. The stipulation also recited that the appellant was the State Treasurer of Alabama from the time she was elected and was at the time of the trial the State Treasurer of Alabama.
Wiley O. Weaver was employed by the State of Alabama in the State Auditor's Office. He testified from "bank record reconciliations" that as of June 1977 the State Treasurer of Alabama controlled $438,100,870.62. Of that amount, $169,380,000 were time deposits and $268,720,000 were demand deposits. Weaver explained that demand deposits do not draw interest and are used to pay current bills owed by the State. Further, he stated that time deposits draw interest in whatever banks they are placed.
Francis Merrifield was a farmer from DeFuniak Springs, Florida. He testified that he had various business interests in Alabama, the main one being a grain elevator located in Geneva, Alabama. According to Merrifield, he owned an interest in "Consolidare Enterprises" which included insurance companies.
He admitted that he knew the appellant, Vance Dyar, Bonny Sutton, George Pihakis, Bill Ellis, and Louise Nolen. Merrifield recalled an occasion, on or about July 6 or 7th, 1977, when he met the appellant, Ellis, Dyar, Pihakis, Sutton and one other unidentified person at the Downtowner Motel in Montgomery, Alabama. The meeting occurred in the lobby and, at that time, the group discussed "Stars Over Alabama" and Consolidare Enterprises. Merrifield acknowledged that the appellant made some comments concerning "Stars Over Alabama." He said, "they had some bills that were passed due and they were needing some funding for a period." He stated that the amount mentioned by the appellant was "75,000 to $100,000."
Also, Merrifield acknowledged that there was a conversation concerning "Consolidare." He testified that the conversation involved "the fact that we needed a loan of 2.1 million dollars" and that the money was to be raised "through bank loans." According to Merrifield, the way to get the bank loans was to be "getting bank loans with their assistance by placing State funds in said bank." Merrifield stated that Vance Dyar asked the appellant if "she saw any problems." According to Merrifield, the appellant responded that "she didn't foresee any problems."
During cross-examination, Merrifield acknowledged that the appellant did not do anything for him to get the loan.
Merrifield recalled that at the Downtowner he had a conversation with Pihakis concerning the National Bank of Commerce. Merrifield stated, "I asked him to call Mr. Weil in Birmingham and see if we could get a loan through for $100,000 on my signature." Merrifiedld testified that the day after the conversation on July 6, 1977, he saw Vance Dyar at the DeFuniak Springs, Florida airport. At that time, Merrifield endorsed the note for $100,000. Merrifield said that he also received at that time a handwritten letter which he later destroyed. Merrifield recalled that, after seeing Dyar at the airport, he [Merrifield] received a telephone call from the appellant who told him that the loan had been turned down in Birmingham. Merrifield said that he was told by the appellant that "it wasn't on account of my financial statement, she told me it was for some other reason, she didn't get into it at great length." According to Merrifield, the appellant was under the impression that the loan had gone through. She told him that they had written checks in the amount of forty or fifty thousand dollars that were outstanding when the loan was turned down. Merrifield testified that he suggested to her that "they could probably get fifty thousand dollars at the American Bank in Geneva, Alabama to make her checks good." He said that the appellant "said she could put some *317 State funds down there to help the situation."
During cross-examination, Merrifield acknowledged that the appellant did not have any interest in Consolidare Enterprises and that he owned the company along with George Pihakis, Ferd Weil and Farris Ritchey.
On further questioning, Merrifield acknowledged that the appellant had an interest in "Stars Over Alabama." In the telephone conversation he had had with her, she told him that the checks bounced at the National Bank of Commerce and that she would give the American Bank of Geneva some deposits if a loan could be arranged there. Further, he acknowledged that he did not endorse appellant's fifty thousand-dollar note to the American Bank of Geneva and did not aid her in getting the money.
Merrifield continued to testify that, after the call to Mrs. Allen, he had a conversation with H. G. Hayes, President of the American Bank of Geneva. At that time, he told Mr. Hayes, "I was interested in getting a 2.1 and his bank wasn't big enough to handle it, but he used associated banks and we needed fifty thousand here to make her checks good up there that were outstanding." Further, Merrifield said, "it was understood there would be deposits."
During the trial, Merrifield was asked to examine State's Exhibit No. 4, which was a letter from Francis Merrifield to Mr. Charlie Martin of the National Bank of Commerce in Birmingham, Alabama. Merrifield testified that he had signed the letter and that it had been brought to him by Dyar or Bonny Sutton. Referring to the letter, Merrifield stated, "it's guaranteeing that loan up there for that amounta hundred thousand dollars." Merrifield identified the note which read:
"Dear Mr. Martin: Please accept this letter as my acknowledgement that I have this date signed a blank note which I understand will be completed in the next few days in the principal amount of $100,000."
William D. Robertson, Jr. was a corporate pilot for Faith Investment Corporation of Pensacola, Florida. He explained that Faith Investment Corporation was a holding company owned by E. A. Gregory. After identifying a picture of the corporate aircraft, Robertson stated that, on July 7, 1977, he piloted the airplane from Pensacola to Talladega, Alabama and then to Montgomery. He testified that, when the plane left Pensacola, the passengers were Ed Gregory and Gerald Atkinson. Robertson stated that, after their departure from Talladega, they flew to Montgomery where Dyar and Sutton boarded the plane. They then flew to Pensacola where Gregory and Atkinson departed from the plane.
According to Robertson, he then few Dyar and Sutton to DeFuniak Springs where they remained some sixteen minutes before returning to Montgomery.
Bonny Ray Sutton stated that he knew the appellant. He recalled that on July 7, 1977, he accompanied Dyar to the Downtowner Motel in Montgomery, Alabama. On that date, he saw Mrs. Allen and she, along with the two men, was seated at a table with Merrifield, Ellis, and Pihakis. According to Sutton, they discussed "Stars Over Alabama, a theme park or amusement park or recreation area." Sutton acknowledged that the discussion concerning Stars Over Alabama and a loan to it was held in the appellant's presence. Dyar, Merrifield, and Pihakis were also present during the discussion. He recalled that the subject of a one-hundred thousand dollar loan for Mrs. Allen was discussed.
Also, he stated that "Consolidare" was discussed. He explained that Consolidare was a holding company formed by Pihakis, Merrifield, Ellis and some other people for the purpose of acquiring an insurance company in Florida. Sutton recalled that there was a discussion relating to "Consolidare" and "Stars Over Alabama." He explained "that was the whole purpose of being there. Mrs. Allen and Mr. Dyar were going to attempt to procure a $2,100,000 loan for Mr. Merrifield and his group." Further, he stated, "Stars Over Alabama was going to receive a $100,000 loan" from the National Bank of Commerce in Birmingham.
*318 Sutton testified that the name of Ferd Weil was mentioned during the discussion at the Downtowner Motel. He explained that Ferd Weil was the vice president of the National Bank of Commerce and was also on the board of directors of Consolidare.
Sutton explained that, after meeting at the Downtowner, he accompanied Dyar to the Treasurer's office. They saw the appellant in her office where Dyar then received a check from the appellant in the amount of $200,000.
A copy of that check, payable to the National Bank of Commerce in Birmingham, Alabama, was introduced into evidence. According to Sutton, after the check was handed to Dyar, the two men left the Treasurer's office and drove to Birmingham with Pihakis. In Birmingham, they went to a restaurant where they met Weil. Later, Farris Ritchey arrived. Sutton said that they remained at the restaurant for a couple of hours, then went to the Holiday Inn where they stayed for the night. He testified that the next morning they went to the National Bank of Commerce in Birmingham, where they saw Weil. Sutton stated that Dyar presented Weil with the two hundred thousand dollar check that he had received from the appellant. After a few minutes, Weil returned and handed Dyar a deposit slip indicating a deposit in the account of the State Treasurer, Melba Till Allen, for the amount of $200,000. Also, Weil gave Dyar a promissory note for a hundred thousand dollars and some signature cards. Dyar placed these in his pocket and, afterwards, they drove to the Montgomery Airport. In the waiting room at the Montgomery Airport, they met the appellant and Mrs. Nolen. Sutton stated that, at the airport, the appellant composed a letter which she signed and gave to Dyar. The appellant and Nolen each signed the note and the signature cards, which were also given to Dyar.
Afterwards, they met Gregory and his pilot outside. The appellant, Nolen, Dyar and Sutton were present when Gregory, referring to Dyar, said "I don't know this fellow here, but Mrs. Allen is welcome to use my plane anytime she wants to."
After the conversation, he and Dyar, along with Gregory and the pilot boarded the airplane and flew to Pensacola, Florida, where Gregory deplaned. He stated that the flight was continued to DeFuniak Springs where, on landing, they saw Merrifield and his wife at the airport. According to Sutton, he saw Dyar give to Merrifield the promissory note, the handwritten letter from the appellant, and the letter that was given to Dyar by Mr. Weil. Merrifield signed the note which he handed back to Dyar but kept the handwritten letter. Afterwards, they boarded the plane and flew to Montgomery where they drove by car to Point Aquarius. Sutton stated that the next morning he and Dyar drove to the National Bank of Commerce in Birmingham and handed to Weil the documents that had been signed by Merrifield.
Sutton was asked what he recalled about the letter which Mrs. Allen had written to Merrifield. Sutton testified, "I recall the letter said that in the event that Mrs. Allen was to procure the 2.1 million-dollar loan for Mr. Merrifield, that the one-hundred-thousand dollar note at the National Bank of Commerce, which Mr. Merrifield was signing would be moved to another bank."
During the trial, Sutton identified State's Exhibit No. 8, a deposit slip in the amount of two-hundred thousand dollars to the National Bank of Commerce. Also, the evidence showed that the check of the State of Alabama Treasury Department was written to the order of the National Bank of Commerce on a "demand account."
Sutton then identified State's Exhibit No. 9, a letter dated August 11, 1977, signed by Melba Till Allen and notarized by Louise H. Nolen. Sutton read the letter to the jury. The letter which was from the appellant was directed to Selected Banks of Alabama. That letter read:
"Gentlemen: This letter will introduce Mr. V. C. Dyar, who is assisting me in the formation and combining of various properties owned in part and in whole by me. Mr. Dyar will explain in detail the proposed *319 plan of action I am seeking to develop. Any courtesies extended Mr. Dyar on my behalf, and any assistance you might render will be greatly appreciated. Very truly yours." [Emphasis added.]
Sutton also identified State's Exhibit No. 10, a check for $5,000, payable to cash, signed by the appellant and endorsed by Bonny R. Sutton. Sutton said that the check was given to him at Point Aquarius by the appellant for expenses.
During cross-examination, Sutton stated that he had been employed as a club manager at Point Aquarius Country Club, in Talladega County. He said that in July, 1977, he was fired. According to Sutton, he was told that Point Aquarius had been sold to Ed Gregory and that he "wasn't in tune with Mr. Gregory's method of operating."
Sutton denied that he had been discharged from the "Triple T Inns" for excessive drinking, although he did admit that he was fired. Further, he denied that he had been terminated from the Point Aquarius position because he was not performing his job in a satisfactory manner.
On further cross-examination, Sutton was asked if he considered any of the letters carried by him from the State Treasurer to the bank to be a bribe. He answered "no, sir" but said "I thought that it would be an inducement." Also, he was asked if the appellant had received anything of value from any type of inducement he [Sutton] was involved in, and Sutton responded "yes, sir." Further, Sutton stated that he thought what she had received was a thing of value and said, "if a hundred thousand dollar loan is something of value, then I would have to say yes."
On further questioning, he admitted that the appellant had not received anything of value which she "didn't sign a note for." Also, when questioned whether he knew any people who could borrow money without making a note, Sutton responded, "I don't know of any that can borrow that kind of money with doing that." However, Sutton admitted that the appellant did not receive the $100,000 loan.
During re-direct examination, Sutton recalled seeing Jim Case in Illinois and testified that Case had said to him [Sutton] "do you have any papers that Mr. Dyar gave you, or did you get any papers from Mr. Dyar that has anything to do with Mrs. Allen?" Also, he said that the appellant had paid Case's "way up there."
Sutton identified State's Exhibit No. 11, a Certificate of Incorporation of SAND, Inc. Further, he explained that SAND was an "anagram" for Sutton, Allen, Nolen and Dyar. Sutton testified that the purpose of SAND was to purchase Point Aquarius County Club and Resort. Also, he stated that he had seen all of the parties sign the documents of incorporation except Louise H. Nolen and that Mrs. Allen had signed on behalf of Nolen.
Sutton identified State's Exhibit No. 12, a check in the amount of $10,000, payable to the Life Insurance Company of America, signed by the appellant and drawn on the National Bank of Commerce in Birmingham, Alabama. He explained that the check was to be given to "secure an option to purchase Point Aquarius." Further, he stated that Point Aquarius was never purchased by SAND, Inc.
G. Scott Ray, President of Citizens Bank of Talladega, testified that in July, 1977, he knew Bonny Sutton. During that month, Ray cashed a check payable to cash drawn on the National Bank of Commerce and signed by the appellant. He stated that the amount of the check was $5,000 and that it was endorsed by Bonny Ray Sutton.
According to Ray, after the check was returned for insufficient funds, he called the appellant and told her what had happened. He stated that the appellant responded that "it should be good, there was supposed to have been some money transferred and I think perhaps I interrupted her and said, `well, I'll re-run it, or I will re-run, or, maybe she said `that's fine' and that was the gist of the conversation." Ray said that, when the check was later presented for payment, it was honored.
*320 During cross-examination, Ray admitted that Citizens Bank of Talladega had approximately $496,000 in demand deposits from the State Treasurer's Office. Further, he stated that his bank was a "State depository" for a State liquor store account and that the total amount of State funds deposited in his bank fluctuated depending on the sales of the State liquor store. Further, he acknowledged that a normal practice in the banking community was to call the Treasurer's office and ask for State funds when a bank desired them. Ray also acknowledged that the appellant had never asked for anything of value in return for her depositing State money in his bank.
H. G. Hayes was president of the American Bank of Geneva. He acknowledged that he knew the appellant, Dyar and Francis Merrifield. He testified that, during the summer of 1977, he had an occasion to call the State Treasurer. He explained that during the summer of 1977 a severe drought caused farmers in his area to lose about eighty or ninety percent of their corn crops. As a result, they were not able to repay their crop loans to the bank. He testified that he talked to the State Treasurer about getting some State deposits.
Sometime after talking with the State Treasurer, Hayes said he saw Francis Merrifield in July, 1977. On that occasion he gave Merrifield a promissory note and signature cards. Hayes stated that Dyar was with Merrifield at the time. Dyar was told by Hayes that the document should be signed and returned to him along with a financial statement. Further, he said, "I told him not to forget we needed State deposits."
Hayes identified State's Exhibit No. 13, a promissory note for fifty thousand dollars dated August 10, 1977 and signed by Louise H. Nolen and Melba Till Allen. Hayes testified that the note was unsecured.
Also, Hayes identified State's Exhibit No. 15, a $500,000 check from the appellant as Treasurer of Alabama, which was payable to the American Bank of Geneva and which had been deposited as a time deposit. He identified the deposit slip dated August 25, 1977 for a $500,000 time deposit at the American Bank of Geneva. According to Hayes, he received the money from Dyar at the airport then later saw Dyar at the Downtowner Motel with Louise Nolen and the appellant. Hayes testified that after the meeting at the Downtowner, they went to the Sahara Restaurant in Montgomery, Alabama, where he had dinner with Dyar, Nolen and the appellant.
While at the Sahara, Hayes told Allen that the bank needed State deposits and said "in fact we were expecting one that night and she did not have time to bring it." Further, according to Hayes, she did not have the deposit because of "an interview she had had with a news reporter, but that she would send it later, and I asked her for demand deposits rather than time if it was possible." He testified that she explained that, because the legislature was watching closely any demand deposits, she could not place big deposits at any one time at the bank but would send it in small increments from time to time. Hayes told the appellant that Dyar had "promised us State deposits."
Hayes acknowledged that other business was discussed and said, "it was discussed about a corporation that was going to be formed to get letters from some nine banks to consolidate some loans." At that point, he identified State's Exhibit No. 16, a letter of guarantee for the letter of credit. The letter of guarantee reads:
"To Selected Banks of Alabama, from: Melba Till Allen. Gentlemen: As the holder of this letter, you are hereby guaranteed by me that I accept total responsibility for any Letter of Credit issued by you to Leisure and Development Properties, Inc., according to the terms and conditions of said Letter of Credit.
"I have read and understand the terms and conditions of your Letter of Credit, thus making this letter my personal irrevocable guarantee to pay same.
"Copy of this letter will serve the purpose as the original. Sincerely yours, Melba Till Allen."
*321 Hayes also identified State's Exhibit No. 9, a document given to him by Dyar. Hayes stated that he had a copy of the document in his office at the bank. That document was signed by the appellant and read:
"To: Selected Banks of Alabama. From: Melba Till Allen. Gentlemen: This letter will introduce Mr. V. C. Dyar, who is assisting me in the formation and combining of various properties owned in part and in whole by me.
"Mr. Dyar will explain in detail the proposed plan of action I am seeking to develop. Any courtesies extended Mr. Dyar on my behalf, and any assistance you might render will be greatly appreciated."
According to Mr. Hayes, after the meeting at the Sahara he met Dyar in the office at the bank. At that time Hayes received a $225,000 State deposit dated September 2, 1977. Further, he testified that the deposit was in the form of a check payable to the American Bank of Geneva and was a "demand deposit."
Hayes recalled "Leisure Development" property being mentioned at the Sahara by Mrs. Allen. He identified State's Exhibit No. 19 by stating "it's a letter of credit extended by our bank to Mrs. Allen to Leisure Development Properties in Montgomery."
According to Hayes, the original of this letter was in his office. The letter read:
"Leisure and Development Properties, Inc., 1445 Federal Highway, Suite 100, Montgomery, Alabama. Gentlemen: We hereby establish our irrevocable Letter of Credit No. 1 in your favor, in the amount not exceeding $50,000.00 available by your draft or drafts drawn on us at sight on the following conditions. . . ."
Hayes identified his signature on the Letter of Credit. After September 6, 1977, he spoke with Dyar again and asked that the Letter of Credit be sent back to the bank.
During cross-examination, Hayes acknowledged that calling the State Treasurer's office and requesting State deposits was normal procedure for banks. Also, he acknowledged that a normal Federal Reserve practice was to use couriers for delivering deposits.
Hayes testified that the Letter of Credit issued by the Bank of Geneva to Leisure Development Properties, Inc. was rescinded prior to a call from the appellant. Further, Hayes acknowledged that the amount of deposits were not unusual. He admitted that, at the time the $225,000 deposit was made, it brought demand deposits in the Bank of Geneva to approximately $400,000.00. Hayes explained "it could have been because $225,000, had been taken out in August" and the $225,000 deposit would have replenished the amount held by the bank.
Hayes did not recall the exact dates of the withdrawal of the $225,000, deposit as it related to the application of the appellant's loan, but said "the withdrawal came before the application."
On further cross-examination, Hayes was asked:
"Q. Mr. Hayes, I'm a bit confused and to make sure I understand, I'll ask you, sir, whether or not the $500,000.00 the half million dollar deposit, and the $225,000.00 deposit came after Mrs. Allen's loan application?
"A. Yes, sir.
"Q. All right, sir. And did the $225,000.00 withdrawal come just prior to her loan application?
"A. Yes, sir."
Also, Hayes was asked whether the loan made to the appellant was made in the normal course of banking business. Hayes responded "yes, sir." He was then asked:
"Q. It was. And I further asked you was this loan made to Mrs. Melba Till Allen in the expectation of any extra favors or extra preferred treatment at that time, and you told me, no. Is that correct?
"A. I don't recallyou asked me if I was expecting to be repaid, and I said, yes, sir.
"Q. And when you said, `repaid,' I said, `You expect that loan to be repaid?'
*322 "A. Right.
"Q. And, in fact, we even started talking about if you made $50,000 loans around, you would have a hard time explaining to your Board of Directors and your depositors if you didn't expect to be repaid?
"A. That's right.
Finally, Hayes was asked:
"Q. I'll ask you, sir, whether or not you would have made the loan to Mrs. Melba Till Allen had you not expected State deposits ?

"A. No sir." [Emphasis added].
At the end of Hayes' testimony, the State rested its case and the defense moved to exclude based on the following grounds:
(1) "There has been no understanding proven as required by law." (2) The evidence submitted concerning the loan at the National Bank of Commerce had not been "tied up." Defense counsel submitted, "It was put in there intentionally to try to prejudice the jury, and it has not been tied up."
At that point, the court stated:
"Well, I feel like there's sufficient circumstantial evidence to go to the Jury: otherwise, a case such as this could never be proven. I think these are questions for the Jury to determine, so I deny your motion."
On the following day, after the trial had been recessed, the defense attorneys added these grounds:
"[T]his provision under Section 3, sub (a) of the Alabama Ethics Law, we would say, first there has been no showing that there was a direct personal financial gain to the defendant. Rather, the only charge against her is that she received credit or a loan. We submit to the Court that that is not, as a matter of law, a direct personal financial gain. Further, there has been no evidence that it is, as a matter of evidence. So, a failure to show that element of offense, the Motion to exclude should be granted.
"Secondly, we would submit to the Court that the words, `no public official shall use an official position to obtain direct personal financial gain,'in that sentence `use' and `gain' are referred to, and again in the last sentence of Section 3, sub (a) where it says, `unless such use and gain are specifically authorized by law.' We say, first, that the use, as charged in the indictment is that the State Treasurer deposited money in The American Bank of Geneva, a State chartered banking institution.
"We say, first, that as charged in the indictment, and strictly according to the proof that use was, in fact, specifically authorized by law. Secondly, that the gain arguendo, assuming that a loan is a direct personal gain, that the gain, namely, getting the loan, signing the note at the bank, is specifically authorized by law. In short, that the proof is not only failing, but affirmatively shows the contrary; that being, that the use of the office and the gain received are both specifically authorized by law."
The court again denied the motion and the defense presented the case for the appellant. The appellant did not take the stand but called twenty-four character witnesses who testified as to her good character.

I
The appellant complains that she was denied effective counsel "by the court's continuance of CC-78-319 and immediate resetting of CC-78-320 [the case under review] without allowance of additional time for preparation and subpoena of witnesses."
In support of this contention, the appellant has cited Mars v. State, Ala.Cr.App., 339 So.2d 104. In that case, Mars had retained a Birmingham attorney, but on the date of trial, the attorney was not present. However, Mars was represented by an attorney who had been appointed to represent him at arraignment. After arraignment, the appointed attorney had withdrawn in deference to retained counsel. When the retained counsel did not appear, the judge requested that counsel originally appointed to represent Mars for arraignment purposes *323 sit with Mars to protect his rights during the trial.
After the jury was sworn, appointed counsel moved for a continuance on the grounds that other cases appeared on the docket ahead of the Mars case and that Mars' retained counsel had informed the State that he would appear in court that afternoon. At that time the district attorney informed the court that retained counsel had stated in a telephone conversation that he did not represent Mars. Further, the district attorney asserted that, because appointed counsel had represented Mars at arraignment and was present, the case should go forward. At that point, appointed counsel represented to the court that she had withdrawn from the case after arraignment and was not supposed to represent Mars on the day of trial.
The facts in Mars indicate that, after retained counsel did not make an appearance, appointed counsel had only minutes to prepare a defense.
The court determined that, under the circumstances, the trial court had abused its discretion by forcing Mars to trial. This case is clearly distinguishable from the case at bar on the facts alone. The appellant, in the present case, at all times had retained counsel. From the record we note that on March 30, 1977, at the time of her arraignment on the four cases, she was represented by retained counsel. At that time, case number CC-78-319 was set for trial on May 8, 1978, case number CC-78-320 was set for trial on May 22, 1978, case number CC-78-321 was set for trial on June 5, 1978, and case number CC-78-322 was set for trial on June 19, 1978.
On April 27, 1978, a hearing was held on motions filed by the appellant in the above numbered cases, and an arraignment was conducted in CC-78-402. At that time, the appellant was represented by retained counsel, and case number CC-78-402 was set for trial on June 26, 1978.
On May 4, 1978, at proceedings to consider motions filed by the State and the defendant, the appellant was represented by different retained counsel.
At this time, the court informed the new attorneys that the cases had been set in chronological order and that case number CC-78-319 had been set for May 8, 1978, and case number CC-78-320 was set for May 22, 1978.
It is clear that the appellant's case is distinguishable from Mars. The appellant in the instant case was represented by retained counsel at the time of her arraignment until the completion of her trial on May 24, 1978. We note that, although there was a change in representation on April 27, 1978, the second group of lawyers had approximately three weeks to prepare the appellant's defense. As the appellant recognized in her brief, the "matter of continuances are addressed to the sound discretion of the trial court and without a showing of clear abuse, the trial court's decision will not be disturbed on appeal." Hoback v. State, Ala.Cr.App., 338 So.2d 439; White v. State, 44 Ala.App. 312, 208 So.2d 222; Pendley v. State, 43 Ala.App. 140, 181 So.2d 624.
Finally, we note that the day when the trial was actually begun, May 22, 1978, was the date that the presiding judge had originally assigned for the trial. Under these circumstances, the appellant and her attorneys had ample opportunity to prepare her case, and the court's decision to deny continuance was not an abuse of the court's discretion.
Also, our examination of the entire record reflects that the appellant has not shown that she was, in fact, denied effective assistance of counsel because of the insufficient time to prepare her case. It was not shown that counsel's assistance was so grossly inept as to shock the conscience of the court and to make the proceedings "a farce and a mockery of justice." Freeland v. State, 43 Ala.App. 406, 191 So.2d 245; Walker v. State, Ala.Cr.App., 355 So.2d 755; Robinson v. State, Ala.Cr.App., 361 So.2d 1172.

II
Appellant insists that she was not afforded competent counsel when "testimony *324 showed lead counsel was suffering from apparent drug abuse and associate counsel was forced to withdraw." Counsel argues that because "lead counsel was taking a great quantity of pills and was behaving in a generally slovenly manner," appellant was denied due process.
The Supreme Court of Alabama, in Taylor v. State, 291 Ala. 756, 287 So.2d 901, when determining the question whether a defendant was effectively represented, observed that the 5th Cir. Court of Appeals reviewed Williams v. Beto, 354 F.2d 698, wherein that court stated:
"It is the general rule that relief from a final conviction on the ground of incompetent or ineffective counsel will be granted only when the trial was a farce, or a mockery of justice, or was shocking to the conscience of the reviewing court, or the purported representation was only perfunctory, in bad faith, a sham, a pretense, or without adequate opportunity for conference and preparation." [Emphasis added].
The Supreme Court in Taylor v. State, supra, went on to say:
"The `mockery of justice' rule is frequently cited as a minimum standard of competence and efficacy. Other factors often mentioned include the fairness of the trial as a whole, the reasonableness of counsel's assistance, loyalty to client, good faith, and the nature and extent of counsel's pre-trial preparation and opportunity for conference." [Footnotes omitted].
The Supreme Court in Taylor, supra, recognized:
"No one factor determines whether defendant is effectively represented in accord with due process of law."
The court went on to say:
"The nature of the problem of misrepresentation is further reason for the lack of an all-encompassing definition of `effectiveness' or `ineffectiveness.' Effective assistance does not mean counsel is without error. What may later seem to be error may have been a trial tactic at the time. Further, conviction of a client does not prove the lack of skill or zeal on the part of counsel." [Citation omitted].
In Herring v. Estelle, 491 F.2d 125 (5th Cir.), the court stated:
"The governing standard is reasonably effective assistance. One method of determining whether counsel has rendered reasonably effective assistance is to ask whether the proceedings were a farce or mockery. The farce-mockery test is but one criterion for determining if an accused has received the constitutionally required minimum representation (reasonably effective assistance)." [Citations omitted].
We have reviewed the testimony in the hearing on the motion for a new trial. In that testimony, we found that one of appellant's attorneys stated that lead counsel was showing "some slurred speech, . . lack of coordination, stumbling around, saliva was running out the sides of his mouth." Further, appellant's attorney said that he had seen lead counsel take some sort of unknown pills and that they were taken in a large quantity. Also, he stated that, because of lead counsel's condition, the matter was brought to the court's attention.
The judge, during the hearing, stated that he had observed lead counsel and, "I didn't see anything that I thought was wrong with his examination or was not proper in the courtroom, from my observation. But, out of an abundance of caution, and I think you will recall, that I said we would adjourn the case and come back in the morning, and that was the last I heard about it."
Counsel went on to say in conclusion, that, in his opinion, lead counsel's "actions and his condition had a good deal to do with the outcome of the case ... in my opinion it did have an adverse effect in the presentation of her defense. . . ."
At the conclusion of the testimony on the motion for a new trial, the court stated:
"I want the record to reflect that as far as I was concerned in my observation of Mr. Jordan, I saw nothing wrong in his approach of trying the case as a lawyer."
*325 We have examined the record and transcript of evidence in the appellant's case to determine whether lead counsel had rendered "reasonably effective assistance" as a defense attorney for the appellant. We recognized at the outset that our examination is confined to the written word which comes through the record and transcript of evidence. Under these circumstances, we cannot determine precisely what effect the conduct of lead counsel might have had in rendering effective assistance of counsel.
This court does not have the luxury of viewing first hand the activities of counsel during the progress of trial while the evidence unfolds before the jury. The trial judge is in a far better position than we are to determine whether the lead counsel's conduct was such that it did not afford this appellant "reasonably effective assistance" of counsel.
However, we note, from our examination of the record and the transcript of evidence, numerous motions were filed on behalf of the appellant, countless objections were made at the time of trial, many motions for a mistrial were made, and at the conclusion of the trial, a motion to exclude the State's evidence was made. Based on the foregoing, we do not believe that the appellant has shouldered the burden of proving her claim that she was denied effective assistance of counsel. Although we clearly do not condone the use of narcotics by a trial counsel during the trial of a client's case, we are also aware that nowhere in the record does it indicate that the use of narcotics was brought to the attention of the trial judge, nor is it intimated that they were used in contravention of the law. Therefore, under the specific circumstances outlined in appellant's contention, the appellant's burden to prove a claim of ineffective assistance of counsel was not supported. See Harried v. United States, 128 U.S.App.D.C. 330, 389 F.2d 281.

III
The appellant contends that the denial of her request for grand jury testimony of State's witnesses was error. She argues that, "where a witness had taken the stand and a transcript of his grand jury testimony was in the district attorney's office not in possession of grand jury," the appellant should be given access to that witness's testimony before the grand jury.
This court in Sullivan v. State, 43 Ala. App. 302, 189 So.2d 593, held that the trial court in its discretion may allow defense counsel to look at grand jury notes. In Sullivan, defense counsel requested that he be permitted to look at the grand jury notes so that he might better cross-examine the prosecuting witness. The court refused the request, but inquired of the State's attorney whether he had referred to the grand jury notes during his examination of the witness. The State's attorney replied that he did have the notes before him, but he had not referred to them during the questioning of the witness. At that point, the court stated that, if the prosecuting attorney had examined the witness from grand jury notes, then the defense attorney would have had the right to inspect them.
Under the circumstances in the case under review, we do not have a factual situation similar to that in Sullivan, supra. Nowhere is it shown that the district attorney was examining any of the witnesses from the grand jury notes. See Hammond v. State, Ala.Cr.App., 354 So.2d 280. Therefore, it is our judgment that no abuse of discretion was shown here.

IV
The appellant, by way of demurrer and motion to dismiss, asserted that the statute under which she was being prosecuted was unconstitutional. She also asserts that during the hearing on the motion for a new trial other grounds were raised which showed the statute was unconstitutional because it was never properly implemented.
She argues that the due process procedures which were mandated were never implemented and that these procedures were a condition precedent to implementation. The appellant maintains she was not afforded due process because she was never *326 given a hearing, was not allowed to confront her accusers, and was not allowed to review the evidence against her.
The Alabama Supreme Court in Comer v. City of Mobile, Ala., 337 So.2d 742, considered the constitutionality of Act No. 130 of the Alabama Legislature, Regular Session 1975, and found the Act "not vague or overbroad." Further, the court recognized that the Act was constitutional when it stated:
"The purpose of Act No. 130 was not so altered as to bring the taint of unconstitutionality to all of its sections not heretofore stricken."
Therefore, it is our judgment that Act No. 130 of the Alabama Legislature, supra, was found to be constitutionally sound in Comer v. City of Mobile, supra.
We now turn to the assertion that the appellant was never afforded a due process hearing where she could confront her accusers and review the evidence against her. Act No. 130, supra, has been codified in the Code of Alabama 1975, in § 36-25-1 through § 36-25-30. Section 36-25-5, entitled "Use of Official Position or Office for Personal Gain" was the section under which the appellant was prosecuted. That section reads:
"(a) No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law. . . ."
Section 36-25-27, reads, in pertinent part:
"(b) All prosecutions for violations of the provisions of this chapter shall be initiated and prosecuted by the attorney general of the state or by the district attorney having jurisdiction of the offense." [Emphasis added].
This provision of Act No. 130, as codified in the Code of Alabama 1975, specifically directs that prosecution for violations of Chapter 25, the code of ethics for public officials and employees, is to be initiated and prosecuted by the district attorney. Although the "ethics commission" established under this Act has the authority to investigate and to report suspected violations to the appropriate law enforcement authorities, nowhere is it mandated that the commission has any authority to prosecute. Affording the appellant in the present case a hearing before the commission would not have prevented the district attorney or the attorney general of Alabama from prosecuting a violation of this Act. It was for the district attorney or the attorney general to determine whether a prosecution was to be initiated.
Certainly, we do not believe that appellant can reasonably maintain that she was not afforded due process at the jury trial by her peers. She was given an opportunity to confront her accusers and to review the evidence against her.

V
The appellant maintains that Act No. 130, supra, is also unconstitutional because the legislature, by the passage of this Act, has "abrogated the Separation of Powers by seeking to remove an Executive Office when such can only be accomplished by Impeachment."
She argues that constitutional officers, such as the Treasurer of Alabama, can only be removed by way of impeachment as specified in the Constitution of Alabama, Article 7, § 173. She insists that any attempt to remove such an officer by way of indictment and trial would be to accomplish indirectly what could not be accomplished directly. We again turn to § 36-25-27, Code of Alabama 1975, which reads, in pertinent part, as follows:
"(c) The penalties prescribed in this chapter do not limit the power of either house of the legislature to discipline its own members or to impeach public officials and do not limit the powers of agencies or commissions to discipline their respective officials or employees."
Any prosecution under the provisions of this Act would in no way amount to impeachment. Offenders of this provision *327 of the Act can only be fined "not more than $10,000.00 or shall be imprisoned for not more than 10 years or both."
Nowhere in this Act is there a provision for the removal of an officer by way of impeachment. On the contrary, it specifically mandates that the penalty prescribed by this chapter in no way limits the power of the legislature to impeach public officials. § 36-25-27(c), supra.
Based on the foregoing, it is our judgment that Act No. 130, supra, is not unconstitutional.

VI
The appellant claims that the district attorney was guilty of prosecutorial misconduct "by his bringing the indictment of Mr. E. A. Gregory three days before the trial of CC-78-319 [in which Mr. Gregory was to testify] for the sole purpose of continuing CC-78-319."
The duties of the district attorney are found in § 12-16-209, Code of Alabama 1975, which reads as follows:
"The district attorney must attend before the grand jury when required by them, and he may do so whenever he sees fit for the purpose of examining witnesses in their presence or giving them legal advice as to any matter connected with their duties; and he may appear before them at any time to give information as to any matter cognizable by them, but he must not be present at the expression of their opinions or the giving of their votes on any matter before them. . . ." [Emphasis added].
After the grand jury has been empanelled, the circuit judge in the county where they are organized instructs the grand jury "relative to the criminal laws of this state. . . (b) It shall likewise be the duty of the judges to charge the grand jury as to all other matters which may be required by law and to instruct the grand juries that it is their duty to indict for the above named offenses, if, in the opinion of the grand jury, the evidence justifies the indictment." Code of Alabama 1975, § 12-16-202.
Further, the concurrence of twelve jurors is required for the finding of an indictment. Code of Alabama 1975, § 12-16-204 reads as follows:
"The concurrence of at least 12 grand jurors is necessary to find an indictment, and when so found it must be endorsed `a true bill' and the endorsement signed by the foreman."
The powers and duties of the district attorney are set out in Code of Alabama 1975, § 12-17-184, which, in pertinent part, reads:
"It is the duty of every district attorney and assistant district attorney, within the circuit, county or other territory for which he is elected or appointed:
"(1) To attend on the grand juries, advise them in relation to matters of law and examine and swear witnesses before them.
"(2) To draw up all indictments and to prosecute all indictable offenses."
We recognize that it is within the discretion of the district attorney to call or not to call certain witnesses in the presentation of the offense before the grand jury although those witnesses are subpoenaed by the district attorney, the foreman of the grand jury or the clerk of the circuit court, "on the application of the grand jury." § 12-16-197, Code of Alabama 1975. See also § 12-16-198.
Whether a particular person is indicted for an offense is a matter addressed to a grand jury. As the appellant recognizes, the district attorney is not present while the grand jurors are expressing their opinions on matters before them, or when they are voting on any matter under consideration.
Under the circumstances outlined in this contention, we find no actions by the prosecutor which would constitute misconduct. All of his actions were in accord with the law and his duty as a district attorney.

VII
The appellant claims that the trial court committed reversible error when it allowed *328 the State to introduce "myriad pieces of evidence, or testimony of other crimes or alleged acts of misconduct of the appellant."
She argues that this testimony and evidence were admitted in total disregard and in violation of the laws of evidence of the State of Alabama. Further, she says the evidence was irrelevant, inflammatory and so prejudicial that she was entitled to a new trial.
The evidence objected to by the appellant, as noted in her brief, is substantially as follows:
(1) Francis Merrifield's testimony concerning Stars over Alabama, Consolidare, Inc. and the National Bank of Commerce in Birmingham.
(2) Merrifield's testimony about a letter of guarantee from Merrifield to Mr. Charlie Martin, President of National Bank of Commerce, the subject of the letter being a $100,000 loan.
(3) Testimony by William R. Robertson, Jr., a pilot for E. A. Gregory, concerning the flight log of the plane and who had ridden in it.
(4) The introduction of a picture of Gregory's plane used by Dyar and Sutton to fly to DeFuniak Springs, Florida.
(5) Testimony by Sutton concerning the following:
a) "A conversation at which the Appellant was present about a $100,000 loan with the National Bank of Commerce and Stars over Alabama. There was no testimony that the Appellant participated, but the Court ruled she need only be present, see CC-78-321.
b) "A hearsay statement purported to be made by Mr. E. A. Gregory that `I don't know this fellow here, but Mrs. Allen is welcome to use my plane any time she wants to.' See CC-78-319.
c) "The witness claimed to have carried a letter from Mrs. Allen to Mr. Merrifield which was subsequently destroyed. He then testified to its contents, see CC-78-321.
d) "That he had seen the Appellant sign two checks, one for $5,000 cash and one for $10,000 cash.
e) "On redirect he claimed to have seen Mrs. Allen sign the name of Louise Nolen to a Certificate of Incorporation of Sand, Inc. and that she had said `I can sign her name as good as she can.' The appellant has yet to be indicted for forgery.
f) "That the Appellant had written a $10,000 check on the National Bank of Commerce of Birmingham payable to the Life Insurance Company of America. CC-78-321."
(6) Ray's testimony about a $5,000 check cashed by Sutton which "bounced."
(7) Hayes' testimony about a personal letter of guarantee given by Mrs. Allen to selected banks of Alabama.
It is elementary that evidence of a distinct substantive offense is not admissible in support of another offense. Gassenheimer v. State, 52 Ala. 313. Although evidence of any offense other than that specifically charged to appellant is prima facie inadmissible, such evidence will be received as an exception to the general rule.
In Dennison v. State, 17 Ala.App. 674, 88 So. 211, we find the following exceptions:
"[W]hen necessary to prove the scienter or guilty knowledge, when an element of the offense charged; (2) when the offense charged and the offense proposed to be proved are so connected that they form part of one transaction; (3) when it is material to show the intent with which the particular act is charged as criminal was done, evidence of another similar act, though in itself a criminal offense may be given; (4) when it is necessary to prove a motive for the criminal act imputed, and there is an apparent relation or connection between that act and other criminal acts committed by the accused; (5) when it is necessary to prove the identity of the offender, or of an instrument used in committing the offense; (6) there are also cases in which the accusation itself involves a series of acts which must be proved to make out the offense; (7) and *329 cases in which the several offenses are all a part of the res gestae."
The Supreme Court of Alabama in Wilkins v. State, 29 Ala.App. 349, 197 So. 75, stated:
"[T]hat in a criminal prosecution proof which shows or tends to show that the accused is guilty of the commission of other crimes or offenses at other times, even though of the same nature as the one charged in the indictment, is incompetent and inadmissible for the purpose of showing the commission of the particular crime charged unless the other offenses are connected with the offense for which he is on trial. In other words, proof of such collateral offenses cannot be used as substantive evidence to establish the guilt of the accused as to the crime charged." [Emphasis added].
The Supreme Court went on to say:
"This well-established principle of criminal evidence, however, is subject to several equally well-established exceptions.. . ."
The court continued:
"But this general rule is not to be followed blindly and evidence rejected on the sole ground that it does show the commission of another crime. If evidence is relevant and competent it should be admitted regardless of its incidental effect." [Emphasis added].
The court went on to quote Underhill's Criminal Evidence, Fourth Edition, § 181, p. 318:
"The exceptions to the general rule arise either from the necessity of the case or the nature of the offense, as for example.. . when the intent or motive is to be proved from the circumstances, or where the identity of the accused is expressly in issue."
The Supreme Court of Alabama then stated that all the exceptions were listed in Wharton's Criminal Evidence, 10th Ed., Vol. 1, § 30, p. 59. After quoting the exceptions the court stated:

"It is recognized that in many instances the line of demarcation is not clear, but the discretion vested in the trial judge, intelligently and considerately exercised, will enable the prosecution fully to present the charge, on the one hand, and, on the other hand, to protect the accused and secure to him the rights guaranteed to him by the Constitution and the laws." [Emphasis added]
There are other cases which recognize these exceptions to the general rule. McCray v. State, 37 Ala.App. 661, 74 So.2d 487; McCary v. State, 39 Ala.App. 642, 107 So.2d 903; Govan v. State, 40 Ala.App. 482, 115 So.2d 667; Johnson v. State, Ala.Cr. App., 335 So.2d 663; Jones v. State, Ala.Cr. App., 362 So.2d 1303.
In the present case, we are concerned with the relevancy of the evidence and testimony as pointed out by the appellant in brief, and whether this evidence and testimony was admissible under the exception to show intent, scheme or design.
In Underhill, Criminal Evidence, 4th Ed., § 184, p. 333, we find:

"All evidence is relevant which throws, or tends to throw, any light upon the guilt or innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove that at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If the evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime or may establish some collateral and unrelated fact." [Emphasis added].
See Moore v. United States, 150 U.S. 57, 14 S.Ct. 26, 37 L.Ed. 996.
In McElroy's Alabama Evidence, 3rd Ed., § 69.01(1), p. 135, we read:
"However, it must not be considered that such a listing of admissible purposes was intended to be exhaustive. It must ever be borne in mind that the State may *330 prove the accused's commission of another crime if such other crime is relevant for any purpose other than that of showing his guilt through the medium of bad character." [Emphasis added].
Also, we find in McElroy, supra;
"The foregoing exclusionary rule does not work to exclude evidence of all prior crimes, only such is offered to show the defendant's bad character. If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than as tending to prove guilt via bad character, then proof of such other act is admissible." [Emphasis added].
Finally, at § 69.01(6) in McElroy, supra, we see:
"Evidence of the accused's commission of another crime is admissible if such evidence, considered with other evidence in the case, warrants a finding that both the now-charged crime and such other crime were committed in keeping with or pursuant to a single plan, design, scheme or system."
Lindsay v. State, 41 Ala.App. 85, 125 So.2d 716; Whitehead v. State, 16 Ala.App. 427, 78 So. 467.
In the present case, the contention of the appellant that the evidence and testimony of other acts were inadmissible because they tended to prove that she was guilty of other crimes is not sustained. It is well settled by the foregoing decision that, while evidence of a commission of one crime is not inadmissible to establish a party's guilt to the charged crime, such evidence is admissible if relevant to prove another crime. Where such evidence forms a link in a chain of circumstantial facts which lead to the transaction involved, we think there can be no doubt under the authorities that such evidence is admissible.
The evidence at appellant's trial showed that two corporations in which she was involved were in need of money. Also, there was testimony tending to show that a plan was designed to obtain loans from State banks by offering those banks large deposits in exchange for those loans. Further, the evidence shows that the first attempt was to obtain money from the First National Bank of Commerce in Birmingham. The testimony in this regard involved the making of a loan application and the signing of signature cards and promissory notes, followed by a trip to Florida on an airplane belonging to E. A. Gregory. The purpose of the trip to Florida was to gain Merrifield's signature as a guarantor of the loan.
There was evidence which showed that, because the appellant wrote checks on the bank, she was under the impression that the loan had been made. However, when it was learned that the loan had failed, the appellant then turned to the American Bank of Geneva. At this time, signature cards, a loan application and notes were signed by the appellant in exchange for placing State deposits in this bank. The president, Mr. Hayes, granted the loan to the appellant.
The evidence recited above reflects that the State proved its case against the appellant. All the evidence was actually a part of one transaction engaged in for the purpose of obtaining financing in exchange for placing State deposits. In this regard, we find that the evidence was relevant to the offense being tried.
After a careful examination of the evidence and testimony, which appellant contends was erroneously admitted, we are clearly of the opinion that no reversible error was shown. Also, we find nothing which requires, or would justify, an interference with the judgment.

VIII
The appellant has challenged the sufficiency of the State's evidence in motions to exclude and for a new trial.
In the matter of the appellant's association with the different organizations, the foregoing facts show:
"The appellant apparently had some interest in the development of the park [Stars over Alabama].. . . . . *331 "SAND is an acronym derived from the last names of Bonny Ray Sutton, Melba Till Allen, Louise Nolen, and M. F. Dyar.

. . . . .
"Leisure and Development Properties, Inc. (Leisure) was a corporation organized by the appellant and others apparently for the purpose of consolidating certain loans by obtaining letters of credit from various banks in Alabama." [Emphasis added].
Therefore, the evidence presented at trial and recited above shows Mrs. Allen's involvement in the above named organizations. Her connection with these organizations was also shown when she signed a $100,000 promissory note to obtain a loan for Stars over Alabama, Inc. This note, endorsed by Merrifield, was issued by the National Bank of Commerce in Birmingham, (NBC), in exchange for a deposit in NBC of $200,000.
The evidence reflects that the appellant and Dyar were assisting Merrifield and his group [Consolidare] in obtaining the loan of $2,100,000 for Consolidare, Inc. Additionally, at the time the $100,000 note was issued by NBC, a vice-president of NBC in Birmingham, Ferd Weil, was also a member of the Board of Directors of Consolidare, Inc.
The evidence shows that NBC never made the two loans to the appellant and Merrifield. However, we note that the entire scheme portrayed by the evidence was the development of an Alabama theme park, "Stars Over Alabama" which was to be similar to "Six Flags Over Georgia." SAND, Inc., over ten percent of which was owned by appellant, was organized for the purpose of owning and operating resort properties. SAND, Inc. was to purchase Point Aquarius, a resort. Louise Nolen signed, as appellant did, the $100,000 promissory note, the purpose of which was to obtain a loan for Stars Over Alabama, Inc., and she, as well as appellant, was a stockholder in SAND, Inc.
See Forest Hill v. Latter & Blum, 249 Ala. 23, 29 So.2d 298, where the Supreme Court of Alabama observed:

"The notion of separate corporate existence will not be recognized where a corporation is so organized and controlled and its business conducted in such a manner as to make it merely an instrumentality of another .... The fiction was introduced into the law for certain well-known purposes, but it was not invented to promote injustice or justify wrongs and when so used it should be disregarded. The courts will not allow the corporate entity to successfully masquerade through its officers, stockholders, representatives or associates ...." [Emphasis added].
From such evidence, the jury could reasonably conclude: (1) That Point Aquarius was to be the site for "Stars Over Alabama," or for a resort designed to financially aid "Stars" through its profits; (2) that Stars Over Alabama, Inc., and SAND, Inc. were organized for the same ultimate purpose, the development of a theme park, and; (3) that the $100,000 promissory note which appellant signed was, therefore, on behalf of SAND, Inc. Although the $100,000 loan was never completed, the loan was solicited in exchange for a deposit of State funds by the State Treasurer (Melba Till Allen).
Other actions taken by the appellant indicated her direct association with two of the corporations involved in these transactions. On the date of SAND'S incorporation, Mrs. Allen gave M. F. Dyar a check "for expenses" related to that corporation. She also drew the check used as a binder for the purchase of Point Aquarius, such purchase being a purpose of SAND'S incorporation. The failure to purchase Point Aquarius and, therefore, the fact that the binder check was never presented for payment or cashed is immaterial to the issue of Mrs. Allen's connection with SAND, Inc.
On August 10, 1977, the appellant and Mrs. Louise Nolen signed a $50,000 promissory note issued by the American Bank of Geneva. We note that appellant and Mrs. Nolen were co-signers of the $100,000 promissory note issued by NBC in Birmingham.
*332 We also note there was evidence that the appellant received cash from that note. The $50,000 promissory note contains a notation of $1,125.00 interest paid on September 12, 1977. A payment of interest to keep a note current would indicate that the $50,000 loan was consummated. Merrifield testified that he learned from Mrs. Allen of the $100,000 loan being refused by NBC. He also testified that Mrs. Allen "was under the impression the loan had gone through and they had written checks to the amount of forty or fifty thousand dollars that were outstanding when it was turned down." Merrifield suggested that they could possibly get fifty thousand dollars at the American Bank in Geneva, Alabama to make her checks good. He also testified that appellant, in response to his suggestion said, "she would put some State funds down there to help the situation." After his conversation with appellant, Merrifield visited, during July, 1977, with Hayes, one of the prime owners of the American Bank of Geneva, in Geneva, Alabama, for the purpose of discussing a $2.1 million loan for Merrifield and a $50,000 loan for the appellant. It was understood at that time that the State deposits for the American Bank of Geneva would be forthcoming.
On August 10, 1977, appellant signed the promissory note for $50,000, issued by the American Bank of Geneva; on August 24, 1977, a time deposit of $500,000 in State funds was placed in the American Bank of Geneva, and on September 12, 1977, a demand deposit of $225,000 in State funds was placed in the American Bank of Geneva. From this evidence the jury could have reasonably inferred that a $50,000 loan was made by the American Bank to Melba Till Allen in exchange for State deposits being placed in the American Bank.
Appellant issued a written personal guarantee to pay any Letter of Credit issued to Leisure and Development Properties, Inc. The issuances of the promissory note and the Letter of Credit by the American Bank of Geneva were done in return for the $725,000 in State funds to be deposited in that bank. The fact that the Letter of Credit was later rescinded was immaterial to the issue of appellant's involvement in Leisure.
It may be contended that appellant's personal guarantee on the $50,000 Letter of Credit to Leisure is no indication of any interest of appellant in that corporation. However the Alabama Supreme Court upheld a finding that evidence presented, including evidence that the defendant personally assumed responsibility for liabilities, supported a finding that it was appropriate to treat the corporation and defendant as identical. Cohen v. Williams, 294 Ala. 417, 318 So.2d 279.
Finally, Mr. H. G. Hayes testified that he would not have made the loan to Melba Till Allen if he had not expected State deposits in return.
Sufficient facts were shown from which the jury could reasonably infer that the offense had been committed, therefore, the question was properly submitted to the jury. Hill v. State, 207 Ala. 444, 93 So. 460; Spain v. State, 37 Ala.App. 311, 68 So.2d 53; James v. State, 22 Ala.App. 183, 113 So. 648.
The rule is clearly established that the weight and probative value of evidence are for the jury. Where there is legal evidence from which the jury can by fair inference find guilt, this court has no right to disturb the verdict. Bolton v. State, 21 Ala.App. 373, 108 So. 631; Trussell v. State, 57 Ala.App. 109, 326 So.2d 301; Haggler v. State, 49 Ala.App. 259, 270 So.2d 690; Smiley v. State, Ala.Cr.App., 338 So.2d 491.
Therefore, based on the recited facts, it is our judgment that a jury could see through the corporate machinations and draw the inference that Mrs. Allen's association was for the sole purpose of promoting her corporate endeavors, all of which would ultimately redound to a personal gain on her part.
Under these facts, the evidence was sufficient to support the appellant's conviction; therefore, the judgment of conviction by the Montgomery Circuit Court should be affirmed.
AFFIRMED.
*333 HARRIS, P. J., TYSON and BOWEN, JJ., concur.
BOOKOUT, J., concurs in part and dissents in part.
BOOKOUT, Judge, concurring in part and dissenting in part.
I concur in Parts I through VI, supra, but dissent with Parts VII and VIII of the majority opinion.
From the State's evidence and reasonable inferences therefrom, the jury could have found the following facts to have existed:
Mrs. Melba Till Allen, at the time in question, was the Treasurer of the State of Alabama. As Treasurer, she had absolute discretion as to which banks received state deposits and the amount of each deposit.
"Stars Over Alabama" was a proposed theme park to be built in Franklin and Marion counties. The park was to be somewhat similar to one near Atlanta, Georgia, named "Six Flags Over Georgia." The appellant apparently had some interest in the development of the park, but the extent or percentage of her interest is unknown.
Consolidare, Inc., was a corporation organized for the purpose of acquiring an insurance company in Florida. Francis Merrifield, Ferd Weil, George Pihakis, Bill Ellis, and Farris Ritchey were principals in Consolidare. Merrifield, a millionaire residing in DeFuniak Springs, Florida, apparently held a controlling interest in Consolidare. The appellant held no interest in that corporation.
The National Bank of Commerce (NBC) is a bank doing business in Birmingham, Alabama. Ferd Weil was a vice-president of that bank during the time in question.
SAND, Inc., was a corporation organized for the purpose of purchasing Point Aquarius from Life Insurance Company of America (LICA). SAND is an acronym derived from the last names of Bonny Ray Sutton, Melba Till Alllen, Louise Nolen, and M. F. Dyar. The incorporating papers were signed on July 15, 1977, at Point Aquarius in Alpine, Alabama. Point Aquarius is a country club and resort consisting of approximately 1,200 acres of land. Also included are a club house of about 50,000 square feet, a tennis shop, a pool house, a maintenance building, an olympic size swimming pool, an equestrian club, horse stables, two 18-hole golf courses, 64 or 65 condominiums, and various other facilities. Point Aquarius is located in Talladega County.
Leisure and Development Properties, Inc. (Leisure) was a corporation organized by the appellant and others apparently for the purpose of consolidating certain loans by obtaining letters of credit from various banks in Alabama.
The American Bank of Geneva, Alabama, is located in Geneva County in the extreme southeastern corner of the state a short distance from the Florida state line. At the time in question, H. G. Hayes was the president or chief operating officer of that bank. Geneva County is located in what is commonly referred to as the "Wiregrass" area of the state. During the time in question, the Wiregrass area had been under a lengthy drought condition which had caused the local farmers to lose 80% to 90% of their corn crops. Since many farmers were unable to repay loans due the American Bank at that time, the bank was short of operating funds and was in need of deposits.
On July 7, 1977, the appellant, Vance Dyar, Sutton, Merrifield, Pihakis, and Ellis met in the lobby of the Downtowner Motel in Montgomery. The parties at that meeting discussed the possibility of obtaining loans for Consolidare and Stars Over Alabama. The appellant and Dyar were to assist Merrifield and his group in obtaining a loan for $2,100,000 for Consolidare. In return Merrifield and Consolidare were to assist in obtaining a loan of $100,000 for Stars Over Alabama. Applications for the loans were to be made to NBC as Ferd Weil was a vice-president of NBC as well as a member of the board of directors of Consolidare.
The conversations concerning the loans were carried on in the appellant's presence; however, Dyar and Pihakis did most of the talking. Stars Over Alabama "had some *334 bills that were past due that they were needing some funding for." To obtain the loans for Consolidare and Stars Over Alabama, the appellant was to assist by placing state funds in NBC. At one point in the conversation, Dyar asked the appellant if she saw any problems with that approach, and she said she "didn't see any problems in it."
Following the meeting at the Downtowner, the appellant accompanied by Dyar and Sutton went to the State Treasurer's Office where she obtained a check for $200,000 of state funds to be deposited with NBC. Dyar, Sutton, and Pihakis then drove to Birmingham, spent the night, and delivered the state check to Ferd Weil at NBC on July 8. Weil then delivered to Dyar a promissory note for $100,000 and signature cards. Dyar and Sutton drove to Montgomery and met with the appellant and Mrs. Nolen at the Montgomery airport. The appellant and Mrs. Nolen signed the promissory note and signature cards and gave them back to Dyar. The group then met with E. A. Gregory and his pilot, William D. Robertson, Jr.
After a brief conversation, Dyar and Sutton boarded the airplane with the pilot, Gregory, and a Mr. Gerald Atkinson. The plane was owned by Faith Investment Corporation of which Gregory was the controlling stockholder. The plane then flew to Pensacola, where Gregory resided, and both he and Atkinson deplaned. Gregory had no further connection with the instant case. The pilot then flew Dyar and Sutton to DeFuniak Springs, Florida, where they met with Merrifield who endorsed the promissory note and signature cards and gave them back to Dyar.
Dyar and Sutton flew back to Montgomery, drove to Point Aquarius, spent the night, and drove to Birmingham the next morning. They then went to NBC and gave Weil the documents signed by the appellant, Nolen, and Merrifield. However, NBC never made the two loans to the appellant and Merrifield.
On July 15, 1977, SAND was incorporated at Point Aquarius. At that time the appellant signed a check on NBC payable to cash and gave it to Dyar for expenses. Dyar had Sutton take the check to the Citizens Bank of Talladega, Alabama, cash it, and return the funds to Dyar. Some time around July 25, the president of Citizens Bank called the appellant and informed her that the check had not been honored by NBC due to insufficient funds. The appellant told him the check should be good as some funds should have been transferred to cover it and requested it be presented again for payment. Citizens Bank then returned the check to NBC, and it was honored and paid on July 25.
The appellant likewise wrote a check for $10,000 at Point Aquarius on July 15 payable to LICA. That check was written on NBC and used as a binder on the purchase of Point Aquarius by SAND. However, the sale of Point Aquarius did not take place and that check was never presented for payment or cashed.
On some unspecified date in early June 1977, H. G. Hayes telephoned the appellant requesting state deposits for the American Bank due to the drought conditions in Geneva County. On some unspecified date in July, Dyar and Merrifield came to the bank and picked up a $50,000 promissory note and signature cards from Hayes. As they departed Hayes reminded them that he needed deposits in his bank.
A copy of a $50,000 promissory note dated August 10, 1977, was admitted into evidence. That note was signed by the appellant and Mrs. Nolen. The credit approval space on the note contained a signature purporting to be that of Hayes although he testified that it was not his signature. There is no evidence that the appellant ever received any cash proceeds from the note. The bank later issued only a letter of credit. Some interest was paid on the note, but the record does not reveal who paid it.
On August 24, 1977, Dyar met with Hayes at the Geneva Airport and delivered a $500,000 state time deposit for the American Bank. Later, on some unspecified date, Hayes had dinner with the appellant in Montgomery at the Sahara Restaurant and *335 asked for some demand deposits for his bank. The appellant explained that she could not give him a large deposit because the legislature was scrutinizing demand deposits very closely. However, she stated that she could give him some deposits in small increments. Thereafter, on September 2, Dyar delivered a $225,000 demand deposit to Hayes from the State Treasurer's Office.
On September 6, 1977, Hayes issued a letter of credit to Leisure. The letter of credit read in pertinent part as follows:
"Leisure & Development Properties, Inc.
"1445 Federal Hwy. Suite 100
"Montgomery, Al.
"Gentlemen:
"We hereby establish our Irrevocable Letter of Credit No. 1 in your favor, in the amount not exceeding $50,000.00 available by your draft or drafts drawn on us at sight on the following conditions:
"1. The amount and date of negotiation of each draft drawn under this Letter of Credit must be endorsed on the back hereof by the negotiating bank and this Letter of Credit must be cancelled and attached to the draft which exhausts the credit.
"2. Drafts drawn under this Letter of Credit must be marked `Drawn under the American Bank, Letter of Credit No. 1, dated September 6, 1977.'
"3. If the draft is drawn by a corporation, a corporate resolution evidencing the authority of the persons signing on behalf of the corporation must accompany the draft or have been previously furnished us.
"4. All drafts must be negotiated after September 6, 1980 (sic) and before September 16, 1980, on which date this Letter of Credit expires.
"5. We hereby agree with bonafied (sic) holders of this Letter of Credit that all drafts drawn under and in compliance with the terms of this Letter of Credit shall be duly honored upon presentation and delivery at the American Bank, Geneva, Alabama, in accordance with the terms hereof.
"Sincerely,
"H. G. Hayes, Jr.
"President
"John T. Ward
"Chairman of the Board."
On some unspecified date after the issuance of the letter of credit, Hayes spoke with Dyar and requested that the letter of credit be returned to the bank. Dyar complied with the request and returned the letter of credit, likewise on some unspecified date. At some later unspecified time after the issuance of the letter of credit, appellant called Hayes and requested that the letter be rescinded. Hayes stated that he had already rescinded it at the time he received the appellant's call.
On August 11, the day after the $50,000 note to the American Bank was signed, the appellant wrote and delivered to Dyar the following letter:
"To: Selected Banks of Alabama
"From: Melba Till Allen
"Gentlemen:
"This letter will introduce Mr. V. C. Dyar, who is assisting me in the formation and combining of various properties owned in part and in whole by me.
"Mr. Dyar will explain in detail the proposed plan of action that I am seeking to develop. Any courtesies extended to Mr. Dyar on my behalf, and any assistance you might render will be greatly appreciated."
Likewise, on August 23, 1977, the appellant wrote, signed, and delivered to Dyar the following letter:
"To: Selected Banks of Alabama
"From: Melba Till Allen
"Gentlemen:
"As the holder of this letter, you are hereby guaranteed by me that I accept total responsibility for any Letter of Credit issued by you to Leisure and Development Properties, Inc., according to the terms and conditions of said Letter of Credit.
"I have read and understand the terms and conditions of your Letter of Credit, thus making this letter my personal irrevocable guarantee to pay same.

*336 "Copy of this letter will serve the purpose as the original.
"Sincerely yours,
"Melba Till Allen."
H. G. Hayes testified that while having dinner with the appellant in Montgomery he told her that Dyar had promised him some state deposits. He did not recall what, if anything, the appellant replied. He did, however, recall other business being discussed at the meeting. "It was discussed about a corporation that was going to be formed to get letters of credit from some nine banks to consolidate some loans." The appellant's letter to selected banks of Alabama dated August 11, 1977, was identified by Hayes. He stated that he had one in his bank, but did not recall from whom he received it. That letter was then introduced into evidence as State's Exhibit No. 9. Hayes next identified the appellant's letter of August 23, 1977, to selected banks of Alabama. He stated that the letter was given to him by Dyar, and it was introduced into evidence as State's Exhibit No. 16.

I
At the end of the State's case in chief, the defense moved to exclude the evidence on the ground inter alia that there was no showing that appellant received a direct personal financial gain in the transaction with the American Bank. The trial court denied the motion. The existence of and extent of the appellant's interest in the corporation which received the letter of credit from that bank was a crucial element of proof at trial and now on appeal.
When the prosecution attempted to admit into evidence the American Bank's letter of credit to Leisure, the following occurred:
"MR. JORDAN: (viewing document) It purports to be a letter dealing with Leisure Development Corporation or a business that we're unfamiliar with, and unless he can tie Mrs. Allen in as a stockholder, director, incorporator, or officer of Leisure, I don't see what it has to do with her. She may have been a guarantor for a note for them but that's all.
"THE COURT: Does it have any connection with this?
"MR. EVANS: Yes, sir. I believe this witness, Your Honor, testified that at the Sahara Mrs. Allen told him she was forming this holding company
"MR. JORDAN: Your Honor
"MR. EVANS: I believe you heard the witness. He said he was out at the Sahara and Mrs. Allen discussed with him the formation of a holding company there for her indebtedness.
"THE COURT: Of Leisure Company?
"MR. EVANS: Yes, sir. He said Leisure Development from the stand.

"THE COURT: Was that your testimony?
"MR. JORDAN: He didn't name the company
"MR. EVANS: Yes, he did. Let's play the record back.
"THE COURT: No, let's just ask him the question.
"MR. EVANS: All right.
"BY MR. EVANS: (Continuing)
"Q. Mr. Hayes, do you remember the Leisure Development property being mentioned at the Sahara by Mrs. Allen?
"A. Yes, sir.
"THE COURT: All right. Overrule your objection."
(Emphasis supplied.)
The letter of credit was then admitted into evidence and read to the jury.
The prosecution's representation to the trial judge was inaccurate. The record reveals that in Hayes' earlier testimony he merely said, "It was discussed about a corporation that was going to be formed to get letters of credit from some nine banks to consolidate some loans." The only mention of Leisure was in the "Selected Banks" letter from appellant which Hayes read into evidence. Hayes did not say in his prior testimony that appellant told him she was forming Leisure, although an inference can be drawn that Leisure was the corporation she was discussing. However, nothing in Hayes' testimony tends to prove the extent of her ownership or interest in Leisure. That the appellant mentioned "Leisure Development *337 property" in the conversation likewise falls way short of proving the extent of her interest or ownership in that corporation.
The appellant's letter of August 11 to selected banks stated that Dyar was assisting in the "formation and combining of various properties owned in part and in whole by me." She stated therein that Dyar would explain the proposed plan of action and stated that she would appreciate any courtesies extended to Dyar on her behalf. The August 23 letter to selected banks stated that she guaranteed and accepted total responsibility for any letter of credit issued by such selected bank to "Leisure and Development Properties, Inc." She stated therein that she had read and understood the terms and conditions of the letter of credit from the selected bank or banks and that her instant letter was her personal irrevocable guarantee to pay the same.
That the appellant had some interest in securing a letter of credit for Leisure is obvious from the letters of August 11 and 23 received by Hayes. The extent of her interest or the percentage of her ownership in such business however is not disclosed in the record. No certificate of incorporation was introduced to connect the appellant with the ownership of the corporation, no testimony was given as to her ownership interest, and no testimony was given as to the proposed plan of action she was seeking to develop through Dyar and what connection such plan had with various properties owned in part or in whole by her.
The record does connect the transactions at NBC with appellant's desire initially to obtain the loan or letter of credit from the American Bank of Geneva. The appellant was attempting to obtain a $100,000 loan through NBC in connection with developing the theme park Stars Over Alabama. The letter of credit from the American Bank of Geneva was to Leisure and Development Properties, Inc., and was for the purpose of some unstated "proposed plan of action" which she was seeking to develop. Merrifield testified that after the NBC loan was turned down he had a discussion with the appellant:
"A. She was under the impression the loan had gone through, and they had written checks to the amount of forty or fifty thousand dollars that were outstanding when it was turned down.
"Q. What, if anything, else did you say to her?
"A. I suggested that they could probably get fifty thousand dollars at the American Bank in Geneva, Alabama, to make her checks good.
"Q. And what, if anything, did she say to you after that?
"A. She said she could put some State funds down there to help the situation."
Thus, the only connection between NBC and the American Bank loan appears in Merrifield's testimony that "they" had some $40,000 to $50,000 in outstanding checks in NBC and that appellant would send some state funds to the American Bank to help in obtaining a loan to cover those checks. Stars Over Alabama then faded from the record. When the transaction with the American Bank was finally consummated in August and September, it involved not Stars Over Alabama, but Leisure and Development Properties, Inc.
There is little doubt that the appellant used her position to obtain a letter of credit for Leisure and Development Properties, Inc. The inference is that she had some financial interest in the corporation as she guaranteed and accepted responsibility for any letters of credit issued to Leisure. It is probable that the properties owned "in part and in whole" by the appellant with which Dyar was dealing had some connection with Leisure. The only thing that is clear is that Hayes issued the letter of credit to Leisure in return for not only the Allen-Nolen promissory note of August 10, but because of the state deposits which appellant would place in the American Bank.
The placing of state deposits in banks to induce either personal or corporate loans is not malum in se, but is malum prohibitum. Such conduct is only illegal because the Ethics Act of 1975 declares it to be so. And *338 to bring that conduct within the prohibition of that Act, the State must prove each element of the offense as written by the legislature.
It is an age old principle in our system of justice that criminal statutes are strictly construed in favor of the persons sought to be subjected to their operation. Schenher v. State, 38 Ala.App. 573, 90 So.2d 234, cert. denied, 265 Ala. 700, 90 So.2d 238 (1956). Such statutes reach no further in meaning than their words. Fuller v. State, 257 Ala. 502, 60 So.2d 202 (1952). Therefore, regardless of how improper the conduct of an accused may appear, the State may not brand that person a criminal and imprison him except by strict proof conforming to the wording of the criminal statute in question.
The State proved that the appellant used her official position to obtain a letter of credit for Leisure and Development Properties, Inc. This alone amounts to no crime under the statute. The State must have also proved that through the letter of credit she obtained "a direct personal financial gain" for herself or for a business with which she was associated.
The evidence fails to establish a "direct personal financial gain" prohibited by the statute. The gain, if any, would have been through one of the corporations involved in the transactions. Under the specific charge in the indictment, it may only come through Leisure and Development properties, Inc., in which she inferentially held some interest.
In order to prove the appellant's corporate dealings to be in violation of the Ethics Act, the State had the burden of proving that the financial gain was for a business with which she was associated, as defined in § 2(b) [now § 36-25-1(2)]:
"`Business with which he is associated' [means] any business of which the person or a member of his family, is an officer, owner, partner, employee or holder of more than 10 percent of the fair market value of such business." (Emphasis supplied.)
No proof was made that the appellant was an officer or employee of Leisure. It being a corporation, she could not have been a partner within the legal definition of that term. Ownership in a corporation is denoted by holding or owning stock therein. Therefore, for the appellant's actions to be in violation of the terms of the statute, the State must have proved that she owned or was the "holder" of "more than 10 percent of the fair market value of such business." This the State failed to do, and the appellant's motion to exclude the State's evidence should have been granted.

II
An additional ground for error appears in the record.
The State introduced into evidence the fact that the appellant gave Dyar a check for $5,000 on NBC which was returned due to insufficient funds. The State likewise introduced the second check written by the appellant on NBC in the amount of $10,000 payable to LICA. Over objection by the appellant, the court admitted those checks into evidence. Over the appellant's objection that the checks had no material connection with the transaction for which she was indicted, the prosecution argued, "I want to show, Your Honor, that at the time these checks were written, it (sic) wasn't enough money in the National Bank of Commerce to cover these amounts."
The defense then further objected:
"MR. JORDAN: . . . Your Honor, we submit and we firmly object, he's presenting evidence of a separate and distinct criminal offense under the laws of the State of Alabama involving a bad check with insufficient funds, it cannot be brought into this proceeding. It's grounds for a mistrial, and we move for a mistrial. He intentionally did that.
"THE COURT: Motion denied. Motive? Is that what you're saying?
"MR. EVANS: Yes, sir. She had to get money out of Geneva to cover these checks.
"THE COURT: All right. Overrule your objection, and deny your mistrial. Proceed."
*339 Again, the prosecution's representation to the trial judge was not factual. The evidence clearly reveals that the checks in question were written on July 15, 1977. The $5,000 check was paid by NBC on July 25, 1977. The $10,000 check was never presented for payment. It bears no stamp denoting that it was refused due to insufficient funds. Over the appellant's objection as to relevancy, the trial court admitted the two checks into evidence to show motive. That is, the prosecution convinced the trial judge that the American Bank loan was motivated by the necessity to cover the July 15 checks written against insufficient funds. The record simply does not support such a finding.
The $50,000 loan application or note signed by the appellant was not dated until August 10, and the letter of credit issued thereon was not dated until September 6, 1977. Thus, the $5,000 check payable to cash had been honored and paid on July 25, some sixteen days before the loan application with the American Bank was dated.
There is no showing in the record that the appellant or any business with which she was associated had outstanding debts or checks pending against an insufficient account at NBC at the time the appellant sought the loan from the American Bank of Geneva on August 10. The indebtedness referred to earlier in the appellant's first dealings with Merrifield and Consolidare were in connection with Stars Over Alabama. The evidence is unclear as to any connection between Stars Over Alabama and Leisure. The evidence is nonexistent as to any connection between those corporations and SAND, Inc. In fact, the entire evidence concerning the formation of SAND and the proposed purchase of Point Aquarius does not appear to have any material connection with the crime charged in the indictment. The checks introduced into evidence concerning SAND and Point Aquarius have no connection with the transactions in question with the American Bank. The only check shown by the evidence to have been returned was later paid on July 25, 1977, over two weeks prior to the appellant's loan application to the American Bank of Geneva and almost a month before the appellant sent a state deposit to the American Bank.
The SAND checks in question show that they were written on Account No. XXX-XXX-X at NBC. Although the bank officials and bank records were subject to subpoena, there is no proof in the record that Stars Over Alabama or Leisure had the same account number at NBC. In fact, there is nothing in the record to show when the SAND account was opened, the cause of the overdraft, the source of funds to cover the overdraft on July 25, whether checks in connection with Stars Over Alabama or Leisure were drawn on that same account, or which parties were authorized to draw on the account.
Although the incorporating papers for SAND were admitted into evidence, none appear of record for either Stars Over Alabama or Leisure. We cannot ascertain from the State's case in chief who the primary stockholders of those latter two corporations were. It is noted, however, that during the case for the defense transactions involving Stars Over Alabama were brought out on cross-examination of defense witness Clay Baker. State's Exhibits 20, 21, and 22 show the following individuals and corporations involved in those transactions in early April 1977 (without showing their specific interest or ownership in Stars Over Alabama): C. Dewey Crowder, John Norman Firth, Louise H. Nolen, Melba Till Allen, Dewey Crowder Associates, Ltd., Hawthorne Melody Farms, Inc., and A. C. Baker.
With the exception of the appellant and Louise Nolen, none of the persons mentioned in the above transaction appear in the record as involved in the Stars Over Alabama-NBC loan, SAND, Inc., or the Leisure-American Bank loan transactions.
The only connection we can find between SAND and Leisure is the fact that Allen, Nolen, and one M. F. Dyar were stockholders in SAND and that Allen and Nolen endorsed the American Bank note and Vance Dyar acted somewhat as a courier in *340 the transaction. SAND had an account at the same bank (NBC) where appellant was earlier trying to negotiate a loan for Stars Over Alabama, but there is no evidence that Leisure had an account there. It is clear that the appellant was involved with a number of individuals in several corporate transactions, but in order to introduce collateral business transactions into evidence they must be relevant to the instant charge.
Evidence is admissible to show a collateral fact only if that collateral fact tends to prove or disprove a matter of fact which has been made an issue in a case. Jones on Evidence, (5th ed.), § 154. The test for relevancy employed in Alabama is that a fact is relevant if there is any logical relationship between that fact and the ultimate inference for which it is offered. Gamble, McElroy's Alabama Evidence, (3d ed.), § 21.01(1). Therefore, the test here would be whether the SAND transactions have any logical relationship with the inference for which such transactions were offered; that is, that the American Bank loan was motivated by a need to cover insufficient checks written in connection with SAND. The State's own evidence shows such motive did not exist and, therefore, the SAND transactions were irrelevant to the charge specified against the appellant in the indictment.
Aside from the general test for relevancy, appellant contends the evidence of issuing a worthless check was evidence of a collateral crime not charged in the indictment and thus inadmissible.
It is a well established rule in this and other jurisdictions that evidence of other or collateral crimes is not admissible as substantive evidence to establish the guilt of an accused. There are, however, well established exceptions to that rule. Wharton's Criminal Evidence, § 31, lists them as follows:
"These exceptions fall under the following general divisions: (1) Relevancy as part of res gestae. (2) Relevancy to prove identity of person or of crime. (3) Relevancy to prove scienter, or guilty knowledge. (4) Relevancy to prove intent. (5) Relevancy to show motive. (6) Relevancy to prove system. (7) Relevancy to prove malice. (8) Relevancy to rebut special defenses. (9) Relevancy in various particular crimes...."
As can be seen, relevancy is the basis for each exception to the general rule enunciated above. That the appellant wrote a worthless check in the SAND transactions has no relevancy: as part of the res gestae of the crime charged; to prove her identity; to prove scienter in obtaining the American Bank loan; to show her motive for obtaining that loan, as previously discussed; to show a system of obtaining bank loans by use of state deposits, as no such deposits were involved in the SAND dealings; to prove her malice in the crime charged; to rebut special defenses; or to "various particular crimes" in which the instant charge is not included.
The Alabama Supreme Court gave a comprehensive discussion of the rule against use of evidence of prior collateral crimes or misconduct in Hinton v. State, 280 Ala. 48, 189 So.2d 849 (1966) and in Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953). Throughout the cases on this point of law, relevancy is the key factor in determining whether collateral misconduct of a defendant is admissible in evidence.
Evidence which tends to show the commission of a collateral crime or wrongful act not charged in the indictment is inadmissible in order "to prevent conviction based on a jury belief that the accused is a person of bad character. The jury's determination of guilt or innocence should be based on evidence relevant to the crime charged." United States v. Turquitt, 557 F.2d 464, at 468 (5th Cir. 1977).
In Johnson v. State, 38 Ala.App. 82, 76 So.2d 351 (1954), it was held to be reversible error on a charge of obtaining property by false pretense to admit into evidence, over objection, that the appellant had given the same bank in question a false financial statement previous to the transaction for which he was being tried.
*341 In McMickens v. State, 16 Ala.App. 78, 75 So. 626 (1917), in a prosecution for larceny of scrap brass, which the defendant sold to a scrap yard, it was held to be error to show other sales of wire and brass by the defendant to the same dealer at various times during the year. Likewise, in Gibson v. State, 14 Ala.App. 111, 72 So. 210 (1916), in a prosecution for sale of illegal liquor, it was held to be error to allow a witness to testify to having seen large quantities of whiskey stored in the back room of the defendant's store some time prior to the sale in question. Since the charge was for selling, the evidence of illegal possession, another similar crime, was held to be irrelevant. The court there stated:
"... It is the established rule that when irrelevant or improper testimony is admitted on a criminal trial, against the objection of the defendant, it will work a reversal unless it affirmatively appear that the effect was to the benefit of, or not injurious to, the defendant ..."
In a much earlier case, the use of evidence of irrelevant but suspicious acts met with the same result. In a prosecution for receiving stolen cotton, the Alabama Supreme Court held it to be error to allow testimony that, during the week previous to discovery of the stolen cotton in the defendant's storehouse, persons were seen going into that storehouse just before and about daybreak "with sacks of cotton, and coming out with the sacks empty." Gassenheimer v. State, 52 Ala. 313 (1875). There the court stated, in pertinent part:
"... The evidence doubtless alarmed the suspicions of the jury, and inclined them the more readily to believe in the guilt of the defendants, and the less inclined to listen to whatever was offered or said in their defence.... Rumors and suspicions may be born of such facts, and depend on such inferences, but not the verdict of a jury which is to stamp dishonor and guilt on the citizen. This must rest on a more substantial basis. The law of the land has a higher logic and humanity than to found its judgments on such facts, and the vague inferences which unreasoning suspicion would draw from them...."
The jury could not infer a connection between Stars Over Alabama and SAND and neither can this court. Inferences cannot be based upon mere speculation. To say the jury could infer that the Stars Over Alabama theme park was to be built at Point Aquarius is the rankest of speculation. Not even a scintilla of evidence supports such a conclusion. In fact, the evidence supports a contrary finding. The record shows Stars Over Alabama was planned for property in the contiguous counties of Franklin and Marion in northwest Alabama. Point Aquarius is located in Talladega County in east Alabama.
The SAND transactions were irrelevant to the crime charged and should not have been admitted into evidence over proper and timely objections. The prejudicial effect upon the appellant is obvious.
I therefore respectfully dissent from the conclusions reached by the majority in Parts VII and VIII, supra.